UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA    )
                                )
v.                             )      No.  18-cr-143-01-JL
                                )
JOSHUA COOK               )

<u>SENTENCING MEMORANDUM</u>

INTRODUCTION

Joshua Cook is a young man who was indicted for distributing fentanyl resulting in death shortly after his 20th birthday.  He facilitated a fentanyl sale to his friend, E.M., with the expectation that she would share some of the drugs with him, which she did.  They used the drugs together.  She died; he did not.

Mr. Cook's offense stems directly from his substance abuse disorder, which has deep physiological, psychological, and societal roots which began growing in his early childhood.  He first used drugs at age 11.  He was first incarcerated at age 13.  Since then, he has spent more time incarcerated than he has spent free.  Because his mother also suffered from addiction, a product of her own mother's addiction, she was unable to steer him down the right path.  In short, Mr. Cook is a young man in desperate need of effective substance abuse and mental health treatment.

Pursuant to a "C plea" agreement, he has tendered a guilty plea to so much of the indictment as charges distribution of fentanyl.  Should the Court accept the agreement, it binds the Court to impose a sentence between 13 and 17 years.  Mr. Cook respectfully suggests that all of the relevant factors, including the Federal Sentencing Guidelines (the "Guidelines"), the specific facts of his offense, his own history of substance abuse, the purposes of sentencing set forth in 18 U.S.C. § 3553, and common sense, indicate that the Court should impose the lowest possible sentence.

BACKGROUND

The Government obtained the instant indictment following the death of E.M. on the morning of February 6, 2018.  In the early morning hours, E.M., who suffered from opiate use disorder, contacted Joshua through Facebook Messenger to obtain narcotics.  She went to a bank at 8:56 a.m., as soon as it opened, to withdraw money for the purchase.  She went to the Best Western hotel in Manchester, where Joshua was staying, and met him in the lobby.  Joshua facilitated her purchase of 2.5 grams of fentanyl.

E.M. and Joshua went into the women's restroom to use the drugs.  She allowed Joshua to use some of her fentanyl.  Joshua had no money, and E.M. had no connections.  Thus, the two helped each other out, with E.M. supplying money and Joshua

2

facilitating her purchase.  This arrangement included an understanding that Joshua would be able to use some of the drugs E.M. purchased.

When they entered the women's restroom, Joshua injected fentanyl in the stall while E.M. used the bathroom mirror to inject fentanyl into her neck.  She overdosed and died; Joshua did not.  E.M. was pregnant at the time.

On the day of E.M.'s death, Joshua was just twenty years old.

Joshua now stands at a crossroads, the path to which has not been easy.  He was born on November 3, 1997.  His parents were young at the time, and ill equipped to raise a child.  When he was two years old, his parents split up, and he lived in the custody of his maternal grandmother and her boyfriend.  He grew up believing that his grandmother was his mother and his uncles were his siblings.

Both Joshua's grandmother and her boyfriend used alcohol excessively.  His grandmother's boyfriend would become abusive towards his grandmother - something Joshua witnessed at a very young age.

By age 5, Joshua's father, Derek Cook, had built a stable life.  Joshua began living with him in Manchester, where he learned the truth about his grandmother and uncles.  Although his father wanted nothing but the best for Joshua, this rocky

start to his life led to behavior problems, which began almost as soon as he started school.  By age 11 or 12, he was skipping school to hang out with older friends, who introduced him to cigarettes and marijuana.  Unsurprisingly, clinicians later diagnosed Joshua with ADHD, oppositional defiant disorder, post-traumatic stress disorder, and generalized anxiety disorder. See Exhibit 1, letter from Jena Vincent, M.Ed, CAGS, LADC.

Desperate for anything to change the trajectory of Joshua's life, his father sent him to a bootcamp-style program in North Carolina.  However, Joshua persuaded his father to allow him to move back home, where his behavior issues and drug use resumed.

When he was in 6th grade, he stole $5 from a classmate to purchase marijuana.  He was expelled from school and put on juvenile probation for robbery.

Although Joshua principally lived with his father, he would stay with his mother, Shannon Nelan, on weekends.  At the time, Ms. Nelan was attempting to recover from opiate use disorder and was using methadone.  Without her knowledge, Joshua would take her methadone, Lunesta, and Tylenol PM, causing him to fail the drug tests that accompanied his probation.

After his expulsion from his school in Manchester, he went to live with his mother in Pembroke so that he could have a second chance in another school district.  However, Joshua was

expelled again when he brought a large bag of marijuana to school.

Somehow, his father persuaded the Manchester middle school to give Joshua another chance for his 8th grade year.  But Joshua's behavior problems only worsened.  He continued skipping school and began running away from home.  His friends who had originally introduced him to marijuana had moved on to pills, which Joshua began using with them - typically Xanax, Percocet, or whatever they had around.

Joshua's behavior led to numerous violations of his juvenile probation.  As a result, Joshua was placed in a series of group homes.  Unfortunately, facilities were ill equipped for Joshua to address his mental health, behavioral, and substance use issues.  There was frequent violence and drug use among the residents.  The staff was not much better, frequently sharing cigarettes with the residents.  Joshua stole a minivan and ran away, which resulted in his commitment to the Sununu Youth Services Center ("SYSC").  He was 13 years old.

Joshua was furloughed from SYSC to his father's house at age 16.  He immediately left his father's house without permission and did not return for several weeks.  He went to stay with a female acquaintance.  When he saw her injecting heroin, Joshua asked to try some.  His friend spread out a line for him to snort, but he declined and asked her to inject heroin

into his arm instead.  She obliged with a used needle.  Joshua
was later diagnosed with Hepatitis-C, which he suspects he
contracted from this first experience.  This all occurred within
twelve hours of leaving SYSC.

While at SYSC, Joshua had heard other prisoners discussing
heroin as if it were fun, glamorous, and cool.  Although he had
been lectured on the dangers of drugs, he had also been expelled
from school twice, sent to a group home, and incarcerated for
the first three years of his teens, so Joshua believed that
nothing mattered.

While on the run, Joshua began injecting heroin every day.
He also injected cocaine and smoked crack-cocaine.  He quickly
ended up back in SYSC.

Joshua encountered little resistance on his path to
institutionalization.  Most children resort to their mothers as
a source of support and guidance.  In Joshua's case, while
detained, his mother was apprehended smuggling Ambien to him in
the detention center.  She was incarcerated as a result.

Joshua was charged as an adult in an assault and battery
case resulting from a fight at SYSC, and aged out of the
juvenile facility soon after.  In the ensuing years, his life
revolved through a cycle of picking up minor charges, violating
probation due to his drug addiction, and ending up back in jail.

During this time, his daily heroin use changed to fentanyl use, simply because fentanyl had become more prevalent.

At around 19 years old, Joshua tried methamphetamine for the first time and developed an addiction immediately.  He spent all of his efforts seeking methamphetamine, while also obtaining enough fentanyl to prevent withdrawal.

During the times when they were both free from custody, Joshua and his mother injected fentanyl together.  On Thanksgiving in 2017, she was shot while confronting an individual with whom Joshua had a disagreement over drugs.  At the time, she was in warrant status on a drug case.  Police arrested her at the hospital.  Afterwards, E.M. and her boyfriend were exceptionally supportive of Joshua, and they became close friends.

Joshua has overdosed on opiates seven times.  One of his overdoses occurred in public at a McDonald's restaurant.  On some of these occasions, his friends revived him with methamphetamine instead of Narcan.

At the time of his arrest on this case, Joshua weighed about 100 pounds.  He was living on the street and owned only the clothes on his back.  He was injecting approximately one finger of fentanyl per day and injecting methamphetamine roughly every 10 minutes.  He had been awake for several weeks.

Beginning around November of 2017, Joshua would frequently stay in various hotel rooms with "K.K."  She was an acquaintance and fellow opiate user.  K.K. sold drugs and worked as a sex worker to support her addiction.

K.K. allowed Joshua to stay in her hotel room if he gave her access to his drug connection, "Brian."  Opiate users in the Massachusetts/New Hampshire area understood Brian's fentanyl to be exceptionally strong, and consequently, his product was highly sought after.  Joshua traded his access to this superior product for a place to stay and a steady supply of K.K.'s methamphetamine.

Joshua was also expected to bring in drug customers for K.K.  Customarily, users allow friends and acquaintances who facilitate drug transactions to take a small amount from the bag at the time of a sale, in exchange for facilitating the deal.[1] Through these arrangements, Joshua was able to satisfy his addiction.

One such customer was Joshua's friend, E.M.  When she contacted Joshua in the early hours of February 6, 2018 to request drugs, Joshua negotiated the price with K.K.  When E.M.

---

[1]     For example, the government's discovery includes Detective Andrew Fleming's recorded interview with Jennifer Howard, the woman who drove E.M. to the bank, then to the Best Western.  Ms. Howard stated that although there was no explicit agreement that E.M. would give her some fentanyl in exchange for the ride, "I'm not gonna lie.  It was assumed that she probably would, but there were times when [she] didn't."

arrived, he ran the drugs down to her in the lobby, expecting
that E.M. would share with him.

After they used the drugs together in the bathroom and E.M.
had apparently overdosed, Joshua rushed back to K.K's room, told
her what happened, and urged her to call an ambulance.  Instead
of calling an ambulance, K.K. demanded the money E.M. owed from
the sale and from a previous debt.[2]

When Joshua was arrested on this case and was entering the
booking area of the jail, he walked directly past his mother who
was, coincidentally, being released at the same time.

E.M.'s death and Joshua's incarceration terrified his
mother to a degree where she finally freed herself from her own
demons.  After countless years of opiate use, she has been clean
for over one year.  She successfully completed drug court, and
she currently works as an addiction counselor.  Recently, she
enrolled in Southern New Hampshire University on a scholarship
to study business management with a minor in addiction
psychology. Exhibit 2, letter from Shannon Nelan.

His mother's success in recovery, in turn, has shown Joshua
that his life is more than a train speeding down a track towards
inevitable destruction.  After years of entangling him in
addiction, his mother has, at last, become a source of

---

[2]     K.K had recently blacklisted E.M. because E.M.'s boyfriend had recently
failed to pay K.K. for drugs that she had advanced.  Joshua withheld E.M.'s
identity from K.K. on the morning of the sale until after she had overdosed.

inspiration, showing him that it is possible to steer his life towards a better future.

## PLEA AGREEMENT

The charge for which Mr. Cook was indicted, distribution of fentanyl resulting in death, carries a mandatory minimum sentence of 20 years imprisonment. 18 U.S.C. §841(b)(1)(C).

Despite Mr. Cook's tragic history, the government declined to withdraw the enhanced indictment unless Mr. Cook agreed to a C plea, which would constrain him to request a sentence of no less than 13 years imprisonment.  The C plea also capped the government's sentencing recommendation at no more than 17 years imprisonment.  Although the government negotiated this deal with a 17-year cap, the government has since taken the position that the Court should sentence the Defendant to 13 years, at the low end of the plea agreement.

## GUIDELINES

The parties agree that Mr. Cook's culpable conduct involves 11.41 grams of converted drug weight.  Consequently, his base offense level is **16**. USSG §2D1.1(a)(5), (c)(12).[3]

The parties agree that a 3-level reduction for acceptance of responsibility applies. USSG §3E1.1.  This results in a total offense level of **13**.

---

[3]      The parties agree that USSG §2D1.1(a)(2) does not apply to Mr. Cook because E.M.'s death is not encompassed by the offense of conviction.

The parties agree that Mr. Cook's criminal history score is 8, which places him in criminal history category **IV**.

For offense level **13** and criminal history category **IV**, the guidelines call for a sentence range of **24 to 30 months.**

ARGUMENT

If the Court accepts the plea agreement, Mr. Cook requests that this Honorable Court sentence him to the lowest sentence possible under that agreement.

The Government negotiated a plea agreement which suggests that a sentence of 17 years is appropriate, despite the fact that the guidelines recommend a sentence of only 24 to 30 months.  Considering the guidelines, Joshua's background, the facts of the case, and the purposes of sentencing, the government's position shocks the conscience.

Joshua recognizes that the facts underlying his case are nothing short of tragic.  A young woman, pregnant at the time, died when consuming drugs he obtained for her.  This is not something he takes lightly.

However, it would be a mistake to view the facts surrounding E.M.'s death without acknowledging the circumstances leading up to it.  Joshua is not a pharmaceutical executive who filled his pockets by encouraging doctors to prescribe opiates he knew would cause addiction, suffering, and death.  He is not a profiteer getting rich from drug deals.  Joshua was barely an

adult at the time of his offense.  The mechanism for his offense
was set in motion years earlier, at the moment when he was first
offered drugs, when he had not yet seen his twelfth year of
life.

Joshua is a casualty of the opioid crisis.  He is not
dissimilar from E.M., whose death he never intended, and which
haunts his every conscious moment.  E.M. was his friend.  He
mourns her death and regrets his role in it.  He is anguished by
the actions he took and the pain her family must now experience
as a result.  If he could, he would trade places with her in a
heartbeat.  He cannot, and he must live with the consequences of
his actions for the remainder of his life.

Yet, the Court should not ignore the impact that drug
addiction has on a person's ability to make decisions.
Notwithstanding modern consensus that addiction is more of a
disease than a choice, the law continues to consider the actions
of those such as Joshua to be of their own volition, making his
criminal liability inescapable.  But his drug addiction has an
equally inescapable impact on an objective assessment of his
relative culpability.

Drug addiction is not simply a psychological problem; a
cycle of poor decision making or lack of willpower.  It is also
not merely physical dependence; the drive to satisfy a craving.
Rather, "addiction represents changes in the brain that lead to

increased craving and diminished capacity for the control of impulses." Neuroscience: Why Neuroscience Matters for Rational Drug Policy, 11 Minn. J.L. Sci. & Tech. 7, 26 (2010).

Drug addiction physically alters the structure and functioning of the brain. National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction, 16 (2020).[4]  Drug use physically changes the prefrontal cortex, which "powers the ability to think, plan, solve problems, make decisions, and exert self-control over impulses." Id.  This causes "a person with a substance use disorder to seek the drug compulsively with reduced impulse control." Id.

It is true that while a person's first time using drugs may involve a truly volitional act, prior to any damage to the part of the brain which controls decision making an impulse control, Joshua's drug use did not.  It began when he was a child.  By the time he was sixteen, he had developed a full-blown substance use disorder, and regularly injected heroin and cocaine into his veins and smoked crack cocaine.  The age of onset of his addiction is crucial for two reasons.

First, the law does not yet trust a person of that age to make a number of decisions that adults are permitted to make - entering into a contract, voting, buying a lottery ticket,

---

[4]     Available at https://www.drugabuse.gov/sites/default/files/soa.pdf.

smoking cigarettes, getting a tattoo, enlisting in the military, deciding a person's fate while serving on a jury.  The law operates in this manner for good reason.  Juveniles lack maturity and possess an underdeveloped sense of responsibility, resulting in "impetuous and ill-considered actions and decisions."[5] Roper v. Simmons, 543 U.S. 551, 569 (2005).  They are "more susceptible to negative influences and outside pressures, including peer pressure." Id.  "The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." Thompson v. Oklahoma, 487 U.S. 815, 835 (1988) (plurality opinion).

In other words, physiological, psychological, and societal factors prevent children - like Joshua, who started using drugs at age 11 - from appreciating the potential consequences of their actions.  Their actions - including Joshua's decision as a youth to experiment with drugs - should be evaluated accordingly.

Second, because juvenile brains are still developing, and because drug addiction physically alters the brain, "adolescence may be a period of heightened vulnerability for a drug's effect

---

[5]     For example, Joshua removed the wires from his own dental braces with pliers - twice - as a pre-teen.

on the brain[,]" and "may interrupt the natural course of brain
maturation and key processes of brain development." Exhibit 3,
Forensic Psychiatry Report.  "Adolescent drug users exhibit
decrements in memory, attention and speeded information
processing, and executive functioning, specifically in future
planning, abstract reasoning strategies, and generation of new
solutions to problems. These behavioral ramifications of drug
use may emerge as a consequence of the reduced volume of
important brain structures (e.g., hippocampus) and abnormalities
in activation during cognitive tasks. Cognitive deficits
resulting from these drug-related neural insults have
potentially harmful implications for subsequent academic,
occupational, and social functioning extending into adulthood."
Id.

In other words, scientific research suggests that an
adolescent's drug addiction prevents the brain from fully
developing.  At the time of the offense, Joshua was barely a
technical adult at age 20, struggling with the physiological and
psychological effects of long-term addiction.

Stated simply, individuals struggling with opioid addiction
do not possess the physiological tools to make decisions in the
same way as healthy individuals.  At the time she injected
fentanyl into her neck, E.M. knew she was pregnant.  Any
rational person examining her conscience would conclude that

shooting fentanyl while pregnant exposes an unborn child to grave risk.  Under such circumstances, at a minimum, the child would be born into opiate addiction.  Before learning first words, taking first steps, or even recognizing his own mother's voice, a child born under such circumstances would know addiction.

E.M. doubtlessly understood this on an intellectual level.  But opioid addiction hijacks decision-making and compels users to act in ways that no rational person would ever act.  Hopefully, no one accuses E.M. of intentionally placing her drive for drugs over the obvious needs of her unborn child.  She was a victim of the opioid epidemic.  She suffered from a disease which rewired her brain.

The same principle applies to any fair assessment of Joshua's conduct.

Joshua never set out to hurt anybody.  He never even set out to make money.  Simply, his addiction, the onset of which occurred when he was just a child, physically altered his brain, impacting his "ability to think, plan, solve problems, make decisions, and exert self-control over impulses." Drugs, Brains, and Behavior, supra, at 16.

At the time of this offense, Joshua had been homeless for years.  He owned a few deactivated cell phones,[6] the clothing on his back, and nothing more.  However, he possessed something of value - he had the phone number for "Brian."  Brian was a fentanyl dealer whose product had a reputation among users as being extremely strong.

Joshua used this, his only resource, to put a roof over his head and service his addiction.  K.K., an acquaintance, allowed him to stay in her room at the Best Western in Manchester.  Like E.M., and like Joshua, K.K. was also suffering from opiate addiction.  She sold fentanyl and methamphetamine and worked as a sex worker to support her habit.

His ability to score free drugs on deals like the sale to E.M. allowed Joshua to maintain his habit.  Like E.M., he did things that he is not proud of, things that he regrets, due to his disease.

Joshua has faced criminal charges before, but nowhere near this magnitude.  He has been incarcerated before, but never with a sentence as hopelessly long as that which his offense of indictment demands.  He realizes the seismic impact this experience has had on his life, not to mention the life of E.M.

---

[6]     Joshua's cell service plan had been cancelled long ago due to non-payment, but he was able to use the phones via free wi-fi when he had the opportunity.

and her loved ones.  And he appreciates that this experience,
though tragic, has given him an opportunity to change the course
of his life which he would not have had otherwise.

Little more than happenstance distinguishes Joshua's fate
from that of E.M.  Without E.M., Joshua would not have been able
to inject drugs in the bathroom that morning.  He could have
overdosed just as easily as E.M.  Had he died instead that
morning, E.M. - who shared the drugs she just bought with Joshua
- would be the subject of the instant indictment.  Presumably,
she would have also faced serious charges in connection with
knowingly exposing her unborn child to fentanyl.

This fine line exposes the duplicitousness of the
government's position on this case.  It was an arbitrary roll of
the dice that E.M. died instead of Joshua - something the
government either failed to realize or refused to acknowledge
when making the decision to charge Joshua with an offense
carrying a 20-year mandatory minimum.  Even now, with full
knowledge of Joshua's history of substance abuse, the government
constrains Joshua to agree to a sentence somewhere between 13
and 17 years, lest he spend 20 years in prison.

The circumstances of this case also expose the emptiness of
the government's rhetoric on the so-called opioid epidemic.
When sentencing drug traffickers, the government justifies its

requests for draconian sentences by expressing a need to protect those suffering from this horrible disease.  But here, when faced with an individual acting under the weight of a terrible drug addiction, with which he was first afflicted as a child, the government sees no reason to protect him.

Stated simply, the Government's position is irreconcilable with its stance on drug offenses in general.  The government has taken a hardline stance that dealers are criminals and individuals suffering from substance use disorder are their victims.  The Department of Justice takes the position that severe sentencing is necessary for large-scale dealers who "threaten[] public health and safety" (Dep't. of Justice, Nashua Man Sentenced to 24 Months for Fentanyl Trafficking, August 31, 2020)[7] by "exploit[ing] the substance abuse proclivities of Granite Staters in order to obtain huge profits." Dep't. of Justice, North Stratford Man Sentenced to 21 Months for Selling Prescription Drugs in School Zone, Sept. 2, 2020.[8]

In advocating for severe sentences for those involved in drug trafficking, the Department of Justice argues that the opiate epidemic is an "urgent public health crisis," and that opioid abuse is "a serious medical condition that knows no

---

[7]     Available at https://www.justice.gov/usao-nh/pr/nashua-man-sentenced-24-months-fentanyl-trafficking.

[8]     Available at https://www.justice.gov/usao-nh/pr/north-stratford-man-sentenced-21-months-selling-prescription-drugs-school-zone.

boundaries across race, age, class or demographics."
Government's Sentencing Memorandum, United States v. Rafael
Rojas-Camilo, 1:14-cr-10367-RGS, Document 286 at p. 12 (D.
Mass., 2016) (internal citations and quotations omitted).  The
Department of Justice observes that "It is remarkably easy to
become addicted to opioids, both psychologically and physically,
and it is exceedingly difficult to break that addiction... For
heroin addicts, seeking and using the drug becomes their primary
purpose in life no matter what consequences may follow,
including death and serious health complications." Id. at p. 13
(internal citations and quotations omitted).

    The Department of Justice takes the position that "the
negative impacts of heroin distribution on individuals,
communities, and society as a whole are staggering[,] and
consequently, an individual's role "in facilitating a large-
scale heroin distribution organization thus is deserving of a
significant sentence of incarceration." Id. at 14.

    The government's treatment of Joshua as a killer, and its
position that it should employ a twenty year mandatory minimum
sentence to extract a sentence of seventeen years in prison
against a young man who developed opiate use disorder as a
child, cannot be reconciled with its position that opiate
addiction is a "public health emergency." See Ending America's

<u>Opioid Crisis</u>, Whitehouse.gov.[9]  It cannot be both.  Joshua
cannot be both culpable as a killer while simultaneously acting
only as a casualty of drug profiteers and the government's
unending war against them.[10]

Stripped of that rationale, the government's position on
sentencing in drug cases loses its connection to its stated

---

[9]     Available at https://www.whitehouse.gov/opioids/.

[10]    The government's sentencing recommendations in recent drug trafficking
indictments also reveal the inexplicable inconsistency in policy.  The
government recommended a sentence of 150 months for Jepherson Cabrera, who
was responsible for selling between four and twelve kilograms of fentanyl,
employed several "runners," and who was recorded on a wire intercept stating
that he had "tied up" and "beat[] up" an insubordinate runner to the extent
that his fingers were "f**ked up, bleeding" from how many times he struck the
runner. Government's Sentencing Memorandum, docket 1:18-cr-0033-11-JL,
Document 429.

The government recommended a sentence of 150 months for Jesus Rivera, a
gang member who distributed 200-gram bags of fentanyl, and who brandished a
gun at rival gang members during a gang fight. Government's Sentencing
Memorandum, docket 1:18-cr-0033-31-JL, Document 666.

The government recommended a sentence of 120 months for Juan Dimel Gil
Castillo, who sold 552 grams of fentanyl to an undercover agent, and who
subsequently led agents on a foot pursuit over a fence and down a 15 foot
embankment, where he punched a state trooper in the head. Government's
Sentencing Memorandum, docket 1:18-cr-0033-20-JL, Document 692.

The government recommended a sentence of 138 months for Julio Saldana,
who was responsible for over 400 grams of fentanyl, managed a subordinate
distributor, and carried a gun in furtherance of his drug activities.
Government's Sentencing Memorandum, docket 1:18-cr-0033-30-JL, Document 580.

The cases described above all stem from the "Martinez" drug
distribution organization.  Investigators linked fentanyl sold by this
organization to four fatal and two non-fatal drug overdoses.  "As
distributors were interchangeable, meeting whichever customers the
dispatchers sent their way, there is no way to know which distributor(s) sold
the fatal doses of fentanyl. It could easily have been any of them." Document
429, supra.

Unlike Mr. Cook, these defendants sold drugs for profit, managed
subordinate drug dealers, used guns or violence, and were linked to <u>multiple</u>
overdose deaths.  Yet, the government recommended less severe sentences for
them than it does for Mr. Cook.

justification.  Instead, all that remains is sentencing as an end to itself.  It must not be so.  Rather, the sentence the court should impose must be sufficient, but no greater than necessary to achieve the purposes of sentencing.

As the Court is aware, the purposes of sentencing are to: (a) reflect the seriousness of the offense, and punish the offender; (b) to afford adequate deterrence to criminal conduct; (c) to protect the public from further crimes of the defendant; and (d) to provide the Defendant with rehabilitative services.

Of course, given what scientific research has uncovered about the nuances of drug addiction, an individual with opiate use disorder who distributes drugs in order to support his habit is differently situated from a for-profit dealer.  For Joshua, who suffers from a disease, the impetus to distribute drugs is inextricably linked to the disease of addiction.  It makes little sense to punish Joshua for his disease in the same way the Court might punish a for-profit drug trafficker.

Moreover, the 17-year sentence the government seeks in the plea agreement bears little relation to general or specific deterrence.  For other opiate users who are sharing drugs or selling drugs to support their habit, the risk of a draconian prison sentence will have little impact on their likelihood of committing an offense similar to Joshua's.  As discussed above, an opiate user's "decision" to use drugs comes from a rewired

brain with a malfunctioning ability to make decisions and control impulses.  Just like the risks E.M. exposed her unborn child to, the threat of a 17-year prison sentence cannot stop a person with substance use disorder from doing whatever it takes to continue using - until such time as they receive effective treatment for their illness.

The same is true as to specific deterrence for Joshua.  The conduct that accompanies addiction is frequently unlawful and dangerous.  Joshua, and any individual suffering from opiate use disorder, need not be convinced of that fact because it is painfully obvious.  But it is not an inability to intellectually understand that drugs are illegal and dangerous that causes individuals to compulsively seek drugs.

Instead, Joshua, like all individuals struggling with opiate use disorder, is in desperate need of rehabilitative services, which are the only thing that can truly deter his drug use and its attendant misconduct.  In 2018, the CDC published a report titled "Evidence-Based Strategies for Preventing Opioid Overdose: What's Working in the United States."[11]  Prison, unfortunately, was not listed as a successful strategy in combating the opioid epidemic.

---

[11]     Available at https://www.cdc.gov/drugoverdose/pdf/pubs/2018-evidence-based-strategies.pdf.

CONCLUSION

Mr. Cook hopes to one day emerge from prison with the perspective and the skills to finally live his life as a truly functional adult.  His actions have cost him the remainder of his youth.  If the Court adopts his sentencing recommendation, he will be released when he is 33 years old.  If the Court adopts the Government's recommendation, he will not be free until he is 37.  He respectfully requests that, if the Court sees fit to accept the plea agreement, this Honorable Court sentence him to a sentence of 13 years as opposed to 17, before he loses any more of his life to this horrible disease.

<div style="margin-left:40%">

Respectfully submitted,
Joshua Cook,
By his Attorney,
/s/ Murat Erkan
_____
Murat Erkan, Esquire
Erkan & Associates, LLC
300 High Street
Andover, MA 01810
(978) 474-0054
Massachusetts BBO# 637507

</div>

October 19, 2020

**CERTIFICATE OF SERVICE**

I, Attorney Christopher Basso, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 19, 2020.

/s/ Christopher Basso
Christopher Basso
Massachusetts BBO# 695588