**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No.  18-cr-143-01-JL** |
| | ) | |
| **JOSHUA COOK** | ) | |

---

## PUBLIC POLICY MEMORANDUM ON SENTENCING
## IN SUPPORT OF DEFENDANT BY
## THE HEALTH IN JUSTICE ACTION LAB
## AT NORTHEASTERN UNIVERSITY SCHOOL OF LAW

### STATEMENT OF INTEREST

The Health in Justice Action Lab at Northeastern University School of Law advances criminal justice reform through a public health lens. Its research and analysis address the role of criminal justice in overdose crisis response, with special focus on drug distribution resulting in death and similar prosecutions that result from accidental overdose events. It therefore has a public policy interest in the issues of this case.

### SUMMARY

Drug Delivery Resulting in Death prosecutions are ineffective at delivering justice to the bereaved, ineffective at reducing drug use and drug sales, and they are counterproductive at reducing drug crime and overdose mortality. The statute and its state analogues were intended to target major traffickers, not people suffering opioid use disorder such as Mr. Cook and E.M. Research from organizations such as the Health in Justice Action Lab have shown that the bulk

of defendants in these cases are people with addiction and low-level sellers. Even if these prosecutions were brought against major traffickers, consistent evidence from the past decades' drug enforcement suggest they would almost certainly be ineffective at reducing drug crime or drug use. Worse, although prosecutors routinely contend that they bring these cases in order to reduce overdose deaths, our research indicates that these cases are likely responsible for thousands of deaths. There are many well-established ways to reduce dangerous opioid misuse and overdose deaths; these prosecutions are not one of them.

## ARGUMENT

### I.     Rather than facilitating, DDRD prosecutions undermine overdose prevention.

Despite the rhetorical acknowledgement that "we cannot arrest our way out" of the overdose crisis, criminal law and its enforcement continue to play a central role among policy responses. Drug delivery resulting in death (DDRD) laws and prosecutions are among the harshest of criminal legal measures purported to address the crisis. The criminal law's approach to drug control pivots on five general goals: (1) to deliver a sense of justice to victims, their families, and the community at large by way of punishment; (2) to deter drug manufacturing and distribution; (3) to deter illicit drug use; (4) to reduce drug-related crime; and (5) to improve the public health, which in the context of the opioid crisis means to reduce overdose death and the spread of infectious disease. Unfortunately, DDRD prosecutions fail to deliver on what they promise. They rarely deliver a measure of justice toward the first goal; they are ineffective toward the second and third goals; and they are actually *counterproductive* to the fourth and fifth.

### a.   DDRD prosecutions deliver scant justice to the families of people who die from accidental drug overdoses because they target the wrong people.

The first goal—to deliver a measure of justice—is rooted in the most obvious of the traditional goals of retributive justice: to assign responsibility and to punish. But to make the sense of justice true and effective to the victims of the crime, that someone can't just be anyone. It needs to be someone whose act(s) carry all or a substantial part of the moral weight of the bad act. In the context of drug crime, this means the major players in the drug trade: the manufacturers, major traffickers, the kingpins. This links to the second goal—to deter drug manufacturing and distribution.

The legislative history of the federal DDRD sentence enhancement[1]—as well as similar state statutes and indeed drug crime legislation in general—makes clear that it was intended to target "the highest level of drug kingpins, which reflects the responsibility of the Federal Government to pursue and prosecute major narcotics syndicates." 132 Cong. Rec. 26,439 (1986) (statement of Sen. Biden). While the Anti-Drug Abuse Act of 1986—also known as the Len Bias law, the basketball star whose accidental overdose death triggered Congress's action—was legislated on an expedited schedule, limiting the scope of its legislative history, the limited legislative history that *does* exist is fairly clear: the law was intended to target major traffickers and to punish them for deaths resulting from their trafficking.

> The bill strikes at the sources of the illicit drug traffic by providing much strong punishment for drug dealers and by making it much more difficult for them to hide their tracks through the laundering of drug money. The legislation thus seeks to deprive drug dealers of the expectation of profit which motivates their activity….Life imprisonment would be mandatory for a … large-scale trafficking offense which results in the death of a person.

---

[1] *See* 21 U.S.C. §§ 841(b), 960(b).

*Id*. at 26, 457 (statement of Sen. Thurmond).[2]

The federal DDRD statute's focus on major traffickers rather than people who suffer from substance use disorders and their co-users aligns with the legislative intent on similar state legislation. For instance, Vermont's "death results" statute specifically states that it is directed "at the entrepreneurial drug dealers who traffic in large amounts of illegal drugs for profit," and that it "is not directed at" people who "resort to small-scale sale of drugs to support their addiction."[3]

When it comes to implementing DDRD-type statutes through investigations and prosecutions, public statements also indicate that they are also intended to target major traffickers. For example, the National Heroin Task Force's recommendation that prosecutors bring more DDRD-type prosecutions was explicitly intended to target major traffickers; it makes no mention of regular users.[4] A National Association of Attorneys General publication exhorted law enforcement and prosecutors to make a "paradigm shift" in how they think about overdose deaths—as crimes, not accidents—and that prosecuting them "is one tool in the law enforcement arsenal which, if used appropriately, can assist locally in focusing on the drug dealers who take

---

[2] *See also id.* at 26,449 (statement of Sen. Rockefeller) ("The bill before now consists of very tough measures to stop drug traffickers, to punish them and others involved in the drug business…."); *id.* at 27,161 (statement of Sen. DeConcini) (advocating "extremely stiff penalties" as a way to "send[] the clear message" that "we are no longer going to tolerate" "the insidious business of drug trafficking," especially where it results in "death or serious bodily harm").

[3] *See* 2003 Vermont Law P.A. 54, §1(2) (legislative findings). *See also* LaSalle, *An Overdose Death Is Not Murder* at 15-16 (quoting legislative statements nationwide, such as "We want to get the drug dealers. That is what this bill is designed to do.").

[4] *See* Dep't of Justice, *National Heroin Task Force Final Report and Recommendations*, at 12 (Dec. 31, 2015), https://www.justice.gov/file/822231/download. ("Federal prosecutors should prioritize prosecutions of heroin traffickers when the distribution of that drug results in death or serious bodily injury from use of that product.").

advantage of those who have become addicted to opioids."[5]

Unfortunately, despite these proclamations as to who the intended target of the DDRD statute would be, when it comes to actual prosecutions, the people who actually get indicted are not manufacturers, kingpins, or major traffickers. The case at bar is like almost all other prosecutions brought under the federal DDRD statute or its state analogues: it is not major players but rather those, like Mr. Cook, who have become addicted to opioids themselves. Despite the explicit intended targets of these laws and policies, their real-world application almost never involves people who are major players, but rather people who are struggling with addiction and who purchase drugs on behalf of themselves and their peers. This is of grave concern because law enforcement and prosecutors are increasingly treating overdose deaths as homicides rather than accidents.[6]

It may be that the *but-for* causation requirement in the DDRD statute, as interpreted by the Supreme Court in *Burrage v. United States*, 571 U.S. 204 (2014), creates evidentiary issues that make it challenging to bring DDRD prosecutions against defendants up the chain. Whether it is this evidentiary challenge or other more institutional factors, nationwide research conducted

---

[5] *See, e.g.*, Mark Neil, *Prosecuting Drug Overdose Cases: A Paradigm Shift*, 3 Nat'l Atty's Gen. Training & Res. Inst. J. 26 (Feb. 2018), https://www.naag.org/publications/nagtri-journal/volume-3-number-1/prosecuting-drug-overdose-cases-a-paradigm-shift.php.

[6] *See* U.S. Dep't of Just., *Nat'l Heroin Task Force: Final Recommendations* at 12 (2015); Nat'l Dist' Att'ys Assoc., *The Opioid Epidemic: A State and Local Prosecutor Response* at 9 (2018); *DIH Charges by Year*. We also call the court's attention to the downstream impact of treating accidental deaths as homicides. Considering that anyone who dies from an overdose received drugs from someone else, this would exponentially increase the nation's homicide rate. There were 17,284 murders and non-negligent homicides in the United States in 2017, but there were approximately 70,000 drug-related overdose deaths. *See* Federal Bureau of Investigation, *Crime in the United States 2017*, Table 1 (2018); Holly Hedegaard et al., *Drug Overdose Deaths in the United States, 1999–2018*, NCHS Data Brief No. 356 (Jan. 2020). Incarcerating people in any meaningful portion of these tragic deaths would mark a definitive retreat from the nation's current effort to shrink its prison population.

by the Health in Justice Action Lab has found that a full half (50 percent) of DDRD and similar

prosecutions are brought against other users, friends, relatives, romantic partners, and people

with whom the decedent had a non-dealer relationship.[7] Only 47 percent were brought against

"traditional" drug dealers, and they were generally selling small amounts of drugs rather than

being major operators.[8]

An extensive study by the New York Times looking at prosecutions in Pennsylvania

came to similar findings. See Goldensohn, They Shared Drugs. Someone Died. Does That Make

Them Killers? New York Times (May 25, 2018).[9] See also An Overdose Death Is Not Murder at

42 (citing research of several state DDRD statistics and finding that: in New Jersey, 25 of 32

identified prosecutions were against friends of the decedent; in Wisconsin, 90 percent of

prosecutions targeted friends, relatives, or low-level street dealers; and in several Illinois

counties, prosecutions usually targeted whoever was the last person with the decedent at the

scene of the accidental overdose). It is clear that the young people involved in this case were not

kingpins or major traffickers. The DDRD statute was not intended to target any of them.

---

[7] *See* Leo Beletsky, *America's Favorite Antidote: Drug-Induced Homicide, Fatal Overdose, and the Public's Health*, 4 Utah L. Rev. 833 (2019), https://dc.law.utah.edu/ulr/vol2019/iss4/4/. Visualizations of the data are available on the Lab's website at https://www.healthinjustice.org/drug-induced-homicide.

[8] *Id*. It is also important to note that, despite the widespread recognition that the overdose crisis was ushered in by pharmaceutical companies, there have been almost no prosecution of company executives. *See*, e.g., Adriana Belmonte, *Coalition to Bill Barr: Imprison pharma executives for their roles in opioid crisis*, Yahoo! Finance (Aug. 31, 2020), available at https://finance.yahoo.com/news/coalition-to-bill-barr-imprison-pharma-executives-for-their-roles-in-opioid-crisis-195223229.html. For a history of the waves of the overdose crisis and the role of pharmaceutical companies, *see generally*, Leo Beletsky & Jeremiah Goulka, *The Opioid Crisis: A Failure of Regulatory Design and Action*, Crim. Just. Mag. (2019), available at https://www.americanbar.org/groups/criminal_justice/publications/criminaljustice-magazine/2019/summer/opioid-crisis/.

[9] Available at https://www.nytimes.com/2018/05/25/us/drug-overdose-prosecution-crime.html.

The fact that the case at bar is a satellite of a complex investigation and multi-defendant prosecution of a major drug trafficking network in Massachusetts highlights this dissonance. Despite cell-phone evidence directly tracing the drugs Mr. Cook and the decedent consumed to this network, only Mr. Cook was charged with DDRD in the decedent's death. See Defendant's Memorandum on Sentencing at 20 n.10. Indeed, no one in that major investigation was charged with any count of DDRD. Astonishingly, the sentences requested by the government for the major traffickers in a network accused of violence, guns, and multiple fatalities were *lower* than the length of sentence it recommends for Mr. Cook.

This misalignment between the legislative intent DDRD-type statutes and their real-world implementation has finally drawn notice, and it is precisely what caused Virginia Gov. Ralph Northam to veto an expansion of the state's felony murder statute last year:

> While I share the goal of addressing the opioid crisis and ensuring drug dealers are punished for supplying dangerous drugs, this bill goes beyond drug dealers and would punish individuals who are themselves struggling with addiction. The way to help individuals struggling with addiction is to ensure they receive proper treatment.

Press Release, Ralph Norman, Governor Northam Vetoes Legislation with Potential Inadvertent Consequences for Individuals Struggling with Addiction (May 2, 2019).

We urge the Court to recognize that DDRD prosecutions were intended to be brought against major traffickers, not people like Mr. Cook. We urge the Court to question what measure of justice can be provided to EM's family and community by prosecuting Mr. Cook as *causing* her *death*—particularly given that a difference in dose, EM might have lived or Mr. Cook might have died.

b.  **Unless proximate cause is established, DDRD prosecutions cannot deliver meaningful justice to the bereaved.**

In addition to targeting the person(s) whose act(s) carry all or a substantial part of the moral weight of the bad act, if prosecutions seek to deliver a meaningful sense of justice to the families and friends of the victims of an accidental overdose death, then the retributive justice model requires the moral weight to be demonstrated. While the Supreme Court did not reach the question of proximate cause in *Burrage*, we submit that courts have an obligation to consider proximate cause in DDRD cases.

There are several general and specific reasons why proximate cause should be considered. First, there is an implicit strict liability-style to the DDRD statute. Criminal law generally frowns upon using the civil law's strict liability regulatory structure, particularly when implicit. See generally Guyora Binder, *The Culpability of Felony Murder*, 83 Notre Dame L. Rev. 965 (2008). Indeed, there is a nearly unanimous scholarly consensus that felony murder and analogous strict liability provisions are both bad law and counterproductive criminal justice policy. *Id* at 966.

The American Law Institute accordingly excludes the felony murder rule from its Model Penal Code and several states have abandoned it. *See* Paul H. Robinson & Tyler Scot Williams, *Mapping American Criminal Law: Variations Across the States, Chapter 5 Felony-Murder Rule*, 1719 Penn. Law Legal Scholarship Repository 3 (2017). Several states and countries have abolished the felony murder rule. *See, e.g.*, Haw. Rev. Stat. Ann. § 707-701; Ky. Rev. Stat. § 507.020; Ohio Rev. Code Ann. § 2903.01; and *People v. Aaron*, 299 N.W.2d 304 (Mich. 1980). For instance, in abolishing the felony murder rule in Massachusetts, the commonwealth's chief justice deemed amplifying the legal consequences of an illegal act absent an inquiry into the

perpetrator's state of mind a "violat[ion of] the most fundamental principle of the criminal law[:] 'criminal liability for causing a particular result is not justified in the absence of some culpable mental state in respect to that result.'" *Commonwealth v. Brown*, 477 Mass. 805, 831 (2017) (Gants, CJ, concurring), *quoting Commonwealth v. Matchett*, 386 Mass. 492, 506-507 (1982).

From a regulatory perspective, strict liability approaches are used in the civil law to control abnormally dangerous behavior. *See generally* Restatement (Third) of Torts § 20(b) (2009). Although fentanyl is a powerfully psychoactive substance, the risk of *overdose* from any particular instance of its use is lower than conventional wisdom perceives—otherwise no one would intentionally seek to consume fentanyl. While fentanyl is more powerful than heroin and the research base on fentanyl is still developing, heroin provides a useful analogy here. Conventional wisdom similarly perceives heroin as carrying an extraordinary risk of overdose from any particular use, but compare this to the evidence: in Philadelphia, there are an estimated 70,000 heroin users, translating to tens of thousands of heroin injections every single day that do not result in overdose. *See* The Mayor's Task Force to Combat the Opioid Epidemic in Philadelphia, *Final Report and Recommendations* 7 (2017). Recent decisions by the Massachusetts Supreme Judicial Court held that frequent heroin use by addicted people does not per se create a likelihood that substantial harm will result for the purposes of civil commitment or involuntary manslaughter. *In Re Matter of G.P.*, 473 Mass. 112 (2015), and *Commonwealth v. Carrillo*, 486 Mass. 269 (2019).

Second, proximate cause ties the chain of causation to the statute's criminally culpable act. Accordingly, it is in the interest of justice to determine whether or not the death resulted from the *distribution* (or foreseeably flowed from the distribution) rather than resulting from something else. Similarly, it is in the interests of justice to conduct an analysis of foreseeable

risks because of the clear assumption of risk by the parties. While each of the young people in the case at bar suffered substance use disorders that might have clouded their perceptions of risk, they did have significant experience consuming drugs, and so they accordingly made their own subjective risk assessments when consuming the fentanyl together (unlike a trafficker who passes risks along).

A foreseeable risk analysis would serve the interests of justice because it would address a more meaningful range of contributing factors. Every fatal overdose results from multiple systems failures. As Section II discusses, there are many ways to successfully treat opioid use disorder, and there are many effective approaches for reducing the risks of illegal drug use. These were absent in the lives of the young people in this case. These were long-term, structural gaps for two people with long-term substance use disorder. In the critical moment, neither the young people nor apparently the motel's staff were equipped with naloxone.[10] A proximate cause analysis would consider all this, as well as the mitigating fact that Mr. Cook *did* try to call 911 to save EM's life, if ineffectually.

As the remainder of this memorandum will show, we do not think that DDRD prosecutions are an effective means of combating the overdose crisis; indeed, they are counterproductive. But if prosecutors are alleging that they are trying to deliver some measure of justice to the bereaved, they must at least target the people who bear real culpability.

---

[10] Numerous public and business establishments where overdoses are known to occur—such as public libraries' and fast food restaurants' bathrooms—have installed motion detectors and timers, and equipped staff with training and naloxone to reduce fatal overdose risk. *See*, e.g., Lola Fadulu, *Is Your Local Coffee Shop a Low-Key Opioid Clinic?*, The Atlantic (Sept. 21, 2018).

###### c.      DDRD prosecutions fail to deter drug sales or use.

The second and third goals—reducing drug trafficking and reducing drug use—are predicated upon the criminal law's belief that it can deter behavior that is condemned by society.[11] While some people will avoid criminal enterprises and illegal drug use because they are illegal, unfortunately, when it comes to people who have entered the drug trade or already misuse drugs—especially those who have developed SUD—this approach falls apart.

There is a broad consensus among scholars and policy analysts that the threat of legal sanction does not deter drug dealing or drug use, even when the threatened punishments are increased. See Tonry, The Mostly Unintended Effects of Mandatory Penalties: Two Centuries of Consistent Findings, 38 Crime & Justice 65 (2009).[12]

Despite decades of effort, there is no evidence that enforcing drug crime laws—from trafficking to possession—has led to reductions in drug use. According to publicly available data from law enforcement, corrections, and health agencies, there is no statistically significant relationship between a state's imprisonment rate for drug crimes and three measures of state drug problems: rates of illicit drug use, drug overdose deaths, and drug arrests. See Pew Charitable Trusts, *Pew Analysis Finds No Relationship Between Drug Imprisonment and Drug Problems* (June 19, 2017).[13]

It is not for insufficient zeal. The DDRD statute was a small piece of a larger legislative

---

[11] See, e.g., Robert Weisberg, *Norms and Criminal Law, and the Norms of Criminal Law Scholarship*, J. Crim. L. & Criminology 476 (2002-2003).

[12] Available at https://scholarship.law.umn.edu/faculty_articles/501.

[13] Available at https://www.pewtrusts.org/en/research-and-analysis/speeches-and-testimony/2017/06/pew-analysis-finds-no-relationship-between-drug-imprisonment-and-drug-problems (including all drugs and all levels of drug offenses, from possession to trafficking).

effort to suppress drug use and sales by deterring them with the threat of greatly increased sentence penalties. Unfortunately, as with the studies cited above, research has found no public safety benefits to increasing sentence length. As more people were convicted to longer federal sentences for drug crimes between 1980 and 2010, "self-reported use of illegal drugs has increased over the long term as drug prices have fallen and purity has risen." Pew Charitable Trusts, *Federal Drug Sentencing Laws Bring High Cost, Low Return* at 1 (Aug. 2015).[14] "[T]he results show there is no statistically significant basis for believing that increasing prison admissions for drug offenses deters drug use." Schiraldi & Ziedenberg, *Costs and Benefits? The Impact of Drug Imprisonment in New Jersey* at 27 (2003).[15]

We should note that when it comes to DDRD cases, there is a significant gap in the evidence: we do not know whether DDRD prosecutions against major traffickers might reduce trafficking because, as discussed in the previous section, major traffickers are essentially never the defendants in these cases.[16]

---

[14] Available at https://www.pewtrusts.org/-/media/assets/2015/08/federal_drug_sentencing_laws_bring_high_cost_low_return.pdf.

[15] Available at https://www.drugpolicy.org/sites/default/files/jpi_njreport.pdf. See also Friedman, et al., *Drug Arrests and Injection Drug Deterrence*, 101 Am. J. of Public Health 344 (2011), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3020200/ (finding that the rate of arrest for possession of "hard" drugs has no correlation with injection drug use); DeBeck, et al., *Incarceration and Drug Use Patterns Among a Cohort of Injection Drug Users*, 104 Addiction 69 (2009), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3731940/ (finding that incarceration for any cause does not reduce injection drug use); and Friedman, et al., *Relationships of Deterrence and Law Enforcement to Drug-Related Harms Among Drug Injectors in U.S. Metropolitan Areas*, 20 AIDS 93 (2006), available at https://www.ncbi.nlm.nih.gov/pubmed/16327324 (finding that the number of police employees or the amount of corrections spending per capita does not reduce injection drug use).

[16] *See America's Favorite Antidote* at 862-863. This is ironic, given that the most common justification for these prosecutions communicated to the press is that they are "sending a message" to deter traffickers' drug sales, even though they are *actually* targeting end users. Adding to this irony, there is data suggesting that people who use, but do not sell drugs are more likely to *later* engage in commercial drug activity due to the opportunity-limiting effects of

Considering all this, even as we can acknowledge that some fraction of society is deterred from using drugs in the first place by the normative effect of the laws making them illegal, enforcement of drug laws—even more aggressive enforcement and sentencing—does not deter people who *already* use from continuing to do so (or major traffickers from continuing to traffic).[17] This is a demand problem. We posit that punitive measures fail to suppress demand for drugs among people with addiction due to the nature of addiction itself.

Substance use disorders change the neurochemistry of the brain. When it comes to addiction, one of the foundational elements of the disease is that it alters brain neurochemistry such that it compels a person to satisfy cravings *despite recognized negative consequences*. *See Definition of Addiction,* Am. Soc'y of Addiction Med. (Apr. 2011). It is worth highlighting that these negative consequences are recognized by the person who is suffering addiction, yet the power of addiction is such that it overcomes the person's desire to avoid those consequences. In this context, ratcheting up criminal consequences to deter behavior that is tied to an individual's addiction is bound to fail because it misses the very definition of this illness.[18]

Addiction was "once viewed largely as a moral failing or character flaw," *Surgeon*

---

incarceration. *See* Amanda Latimore et al. *Predictors of Incident and Recurrent Participation in the Sale or Delivery of Drugs for Profit Amongst Young Methamphetamine Users in Chiang Mai Province, Thailand, 2005-2006*, 22 Int'l J. Drug Policy 259 (2011).

[17] Indeed, there is evidence to show that enforcement's focus on the supply side has, when "successful," actually led to changes in the drug supply that render it more powerful and dangerous. *See generally* Leo Beletsky & Corey Davis, *Today's Fentanyl Crisis: Prohibition's Iron Law, Revisited*, 46 Int'. J. of Drug Policy 156 (2017), available at https://www.ncbi.nlm.nih.gov/pubmed/28735773.

[18] See Przybylsk, *Correctional and Sentencing Reform for Drug Offenders* at 14-16 (Sep. 2009) [hereinafter *Correctional and Sentencing Reform*] (summarizing research). Available at http://www.ccjrc.org/wp-content/uploads/2016/02/Correctional_and_Sentencing_Reform_for_Drug_Offenders.pdf.

*General's Report*, at 2-1[19]. This is rooted in the belief that drug use is entirely voluntary and is an undesirable expression of a person's moral agency. While pre-addiction drug use may have elements of voluntary choice—though the Court should seriously consider what degree the young Joshua Cook ever had in his initial consumption of drugs[20]—if an addiction sets in and until it is treated, the addiction changes the person's brain in fundamental ways that prevent the criminal legal deterrence approach from succeeding.

Addiction is now recognized internationally as "a disorder of the brain," similar to "any other neurological or psychiatric illness," and is considered a chronic, but treatable disease. World Health Organization, Neuroscience of Psychoactive Substance Use and Dependence Summary 14 (2004).[21] See generally *Drug Facts: Treatment Approaches for Drug Addiction, National Institute of Drug Abuse* (Jan. 2018).[22] See also *AMA Applauds Surgeon General Report on Substance Use Disorders* (Nov. 16, 2016) ("addiction is a chronic disease and must be treated as such").[23]

Medical and clinical experts define substance use disorder (SUD) as "an underlying

---

[19] Available at https://addiction.surgeongeneral.gov/sites/default/files/chapter-2-neurobiology.pdf.

[20] Research demonstrates that people, like Mr. Cook, who are exposed to drugs by family members, to trauma, and to inconsistent housing can be driven to initiate drug use, and for those who do so at a young age, the outcomes can be significantly worse, such as higher tolerance and withdrawal symptoms. See Ju Nyeong Park, et al., *Situating the Continuum of Overdose Risk in the Social Determinants of Health: A New Conceptual Framework*, Milbank Quarterly at 7-9 (2020).

[21] Available at https://www.who.int/substance_abuse/publications/en/Neuroscience_E.pdf.

[22] Available at https://d14rmgtrwzf5a.cloudfront.net/sites/default/files/drugfacts-treatmentapproaches.pdf.

[23] Available at https://www.ama-assn.org/press-center/statement/ama-applauds-surgeon-general-report-substance-use-disorders.

change in brain circuits," leading to "a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance-related problems." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 483 (5th ed. 2013) (DSM-5).[24]

When a person is ill with severe substance use disorder, the brain's neural circuitry changes, resulting in a behavioral disorder. *Surgeon General's Report*, at 2-5. These disruptions in the brain impair executive function, triggering dysfunction in a person's "ability to organize thoughts and activities, prioritize tasks, manage time, make decisions, and regulate one's own actions, emotions, and impulses." *Id.* at 2-16.

The altered brain craves to consume the drugs to which it is addicted, but even this concept tends to be misunderstood. There is a common belief that people with SUD simply want the next "hit" or "quick fix" in order to feel "good"—as in to get "high." While there is certainly a high that is experienced by the person using the drugs—a high that may have an emotional content providing a sense of comfort or love that is lacking in the person's daily life—it is too often forgotten that the compulsion to consume drugs is also rooted in a desperate desire to avoid or end the pain of withdrawal. Withdrawal is often described as being "sick," which is understandable given its symptoms: stomach cramps, nausea, fever, sweating, vomiting, diarrhea, and dehydration. In addition to causing extreme "physical symptoms, such as bodily discomfort, pain, sweating, and intestinal distress, and in the most severe cases, seizures," withdrawal also triggers severe anxiety and excruciating negative emotions. Surgeon General's Report at 2-19 to 2-20.

The acute mental and physical agony experienced during withdrawal triggers intense

---

[24] The DSM-5 is a comprehensive, authoritative volume that defines and classifies mental disorders based on the work of hundreds of international experts in all aspects of mental health.

cravings and obsessive thinking about the drug that will provide relief. Surgeon General's Report at 2-19 - 2-20. Indeed, "active recruitment of stress systems" causes a person suffering from addiction to endure "intolerable distress when without the drug." *From Reward to Relief:  The Complex Neuroadaptations Underlying Addiction*, 31 American Academy of Addiction Psychiatry News 5 (Summer 2015). Consequently, "addicted individuals, for whom [the brain's] motivational system is dysregulated, are driven to escape intolerable stress . . . [such that] the drug is often not even experienced as pleasurable, [but] merely as relief." *Id*. Criminal law consequences accordingly fail to deter people with addiction from using drugs.

###### d.      DDRD prosecutions do not reduce drug crime.

When it comes to the fourth goal—of reducing drug-related crime—there is also no evidence that DDRD or other drug prosecutions have a beneficial effect. A comprehensive review of studies analyzing the relationship between drug enforcement and drug violence found that "the existing scientific evidence suggests drug law enforcement contributes to gun violence and high homicide rates and that increasingly sophisticated methods of disrupting organizations involved in drug distribution could paradoxically increase violence." *See, e.g.,* Werb, et al., *Effect of Drug Law Enforcement on Drug Market Violence: A Systematic Review*, 22 Int'l J. of Drug Policy 87 (2011).[25]

###### e.      Treating co-users as distributors undermines federal and state efforts to prevent overdoses from turning fatal.

A key strategy in fighting the overdose crisis is to deploy the overdose-antidote naloxone

---

[25] Available at https://www.sciencedirect.com/science/article/pii/S0955395911000223.

so that it can be administered to prevent overdoses from turning fatal. There are essentially two ways that the federal government and the states are deploying naloxone.[26] One is to distribute naloxone to first responders, including police; the other is to distribute naloxone in the community. Recipients of both prongs of this distribution strategy also receive training on how to use naloxone. Together, these are generally known as Overdose Education and Naloxone Distribution (OEND) programs. These programs help professional and lay responders to recognize and reverse overdose events, preventing a fatal outcome. *See* Alexander Walley et al., *Opioid Overdose Rates and Implementation of Overdose Education and Nasal Naloxone Distribution in Massachusetts: Interrupted Time Series Analysis*, 346 British Med. J. f174 (2013).

The United States is now investing significant resources in community naloxone distribution, Bipartisan Pol'y Center, *Tracking Federal Funding to Combat the Opioid Crisis* at 17 (March 2019).[27] Unfortunately, DDRD prosecutions such as the one at issue interfere with and undermine these lifesaving public health initiatives. Naloxone rescue can only work if there is someone on the scene to administer it, and that someone needs to be able to administer it right away. Since death from opioid overdose is largely due to a reduction in the respiratory drive leading to asphyxiation, any delays in administering naloxone and rescue breathing can lead to brain damage and death.

Timely administration of naloxone is reliant on first responders (EMS, fire, or police) or

---

[26] The brand names of naloxone are Narcan and EVZIO.

[27] For New Hampshire's experience, see Lisa M. Armes, *Optimizing the Effectiveness of Naloxone Distribution in the State of New Hampshire: A Program Evaluation*, DNP Scholarly Projects 36 (2020), available at https://scholars.unh.edu/scholarly_projects/36 (noting that the state did not conduct an evaluation of the various naloxone distribution initiatives).

lay responders (co-users, friends, family, or bystanders). Unfortunately, the risk of being prosecuted for homicide as a result of trying to save someone from dying is interfering with timely naloxone rescue.

To trigger naloxone administration, someone has to be on the scene to recognize an overdose and either administer it him or herself or seek help from someone else, such as by calling 911. While jointly purchasing and using together is a common practice—as Mr. Cook and EM did here—it is not universal. Recognizing that DDRD prosecutions tend to be targeted toward the last person with the decedent, many drug users are opting to protect their friends by consuming drugs alone. This has forced public health agencies to adopt new campaigns to discourage people from using in isolation, using phrases like "Use alone, die alone." *See, e.g.,* Travis Lupick, *If They Die of an Overdose, Drug Users Have a Last Request*, Yes! Magazine, August 25, 2018.[28] Ensuring that someone else is present to reverse an overdose and/or call 911 is critical to preventing accidental overdoses from turning fatal.

If someone is on the scene but does not have naloxone, there is evidence that witnesses to overdose events are often reluctant to call 911—or hesitate for critical minutes before calling—because doing so typically summons not just emergency medical services but also law enforcement, potentially triggering a cascade of legal detriment. This ranges from being arrested and prosecuted for a drug-related crime to losing housing, parental rights, and access to myriad services and education. It is no wonder that legal concerns figure as the top reason overdose

---

[28] Available at https://www.yesmagazine.org/people-power/if-they-die-of-an-overdose-drug-users-have-a-last-request-20180830. It is important to point out that public health and harm reduction messaging does not encourage or recommend drug use. It provides urgent information to prevent overdose deaths while also providing connections for SUD treatment and recovery services and accelerating people's readiness to use those services. *See, e.g.,* Stephanie Desmon, *Go Slow: Using Harm-Reduction Messages to Save Lives in Baltimore*, Johns Hopkins Center for Communication Programs (July 30, 2018).

witnesses do not call 911. *See, e.g.* A.D. Latimore & R.S. Bergstein, *"Caught With A Body" Yet Protected By Law? Calling 911 For Opioid Overdose In The Context Of The Good Samaritan Law*, 50 Int'l J. Drug Pol'y 82 (2017), and *An Overdose Death*. This may be why K.K. thwarted Mr. Cook's effort to borrow her phone to call 911 to save EM's life.

Recognizing this, all 50 states and the District of Columbia—though regrettably *not* Congress—have passed 911 Good Samaritan laws. Legal Science, *Good Samaritan Overdose Prevention Laws*, Prescription Drug Abuse Pol'y System (Jul. 1, 2018). These laws aim to reduce the fears of calling 911 by carving out limited criminal amnesty for overdose victims and witnesses who call for help. Network for Public Health Law, *Legal Interventions To Reduce Overdose Mortality: Naloxone Access and Overdose Good Samaritan Laws* 2 (2018).[29]

However, in only two states do the Good Samaritan laws extend to the situation in which an overdose is not reversed in time and the person dies. This means that any fellow drug user who calls 911 to save a friend is rolling the dice on whether that will result in a life saved and immunity to a possession charge or calling the police on oneself on a homicide charge.

Many public health agencies trying to spread awareness of these laws using messaging such as "Don't Run, Call 911."[30] But these messaging efforts are being overwhelmed by the generous media coverage and active informational outreach by prosecutors. *See* Caleb Banta-Green et al., *Police Officers' and Paramedics' Experiences with Overdose and Their Knowledge and Opinions Of Washington State's Drug Overdose-Naloxone-Good Samaritan Law*, 90 J. Urban Health 1102 (2013). In an effort to "send a message" to deter illegal drug sales,

---

[29] Available at https://www.networkforphl.org/resources/legal-interventions-to-reduce-overdose-mortality-naloxone-access-and-good-samaritan-laws/.

[30] See, e.g., *Save a Life: Don't Run--Call 911*, Warminster, PA (2020), available at https://warminstertownship.org/save-a-life-dont-run-call-911/.

prosecutors and law enforcement often seek—and receive—press coverage when bringing charges or securing a conviction. Nationally, following the surge in prosecutions, media mentions of drug-induced charges or prosecutions have surged by over 300% since 2010. See An Overdose Death Is Not Murder at 2. Additionally, as mentioned above, an increasing number of prosecutors and law enforcement leaders are calling for all overdose sites to be treated as crime scenes, which itself receives media coverage. See Bobby Allyn, *Bystanders To Fatal Overdoses Increasingly Becoming Criminal Defendants*, NPR Morning Edition (July 2, 2018).[31] This all works at cross purposes with the lifesaving potential of 911 Good Samaritan laws. *See*, e.g., Stephen Koester et al. *Why Are Some People Who Have Received Overdose Education and Naloxone Reticent to Call Emergency Medical Services In The Event Of Overdose?* 48 Int'l J. Drug Pol. 115 (2017); Chandler McClellan et al., *Opioid-Overdose Laws Association with Opioid Use and Overdose Mortality*, 86 Addictive Behaviors 90 (Nov. 2018). The result is more, rather than fewer, deaths.

### f.   Prosecutions such as this interfere with the criminal justice system's own public health-oriented efforts to respond to the overdose crisis.

In addition to these major initiatives, prosecutions like the one here also undermine progress in criminal justice agencies' efforts to engage in public health approaches to the overdose crisis. Programs like the U.S. Department of Justice's Comprehensive Opioid Abuse Program (COAP), which invested $162 million in site-based grants nationwide in FY2018, engage law enforcement in overdose prevention and treatment navigation efforts. *America's*

---

[31] Available at https://www.npr.org/2018/07/02/623327129/bystanders-to-fatal-overdoses-increasingly-becoming-criminal-defendants.

*Favorite Antidote*, at 865-68.[32] Through COAP and similar initiatives, an increasing number of departments are seeking to meaningfully engage people affected by addiction.

In addition to distributing naloxone and encouraging witnesses to call for help, outreach efforts by police teams require people to open their doors. Programs such as the Police-Assisted Addiction and Recovery Initiative (PAARI), Law Enforcement-Assisted Diversion (LEAD), and many local and regional initiatives in New England (such as the Gloucester Police Department's Angel program and Plymouth County Outreach) require that users feel comfortable voluntarily approaching police for help accessing support resources. These programs also require police to work in partnership with public health and other sectors.

Creative deflection efforts like these undertaken by nearby criminal justice agencies will be undermined by aggressive prosecutions. As the federal system and more communities embrace alternatives to incarceration, such as deflection and diversion programs, transforming charges like simple possession or possession with intent to distribute into higher-order felonies like homicide or manslaughter renders defendants ineligible for those potentially beneficial programs. *See, e.g.,* Off. of the Dist. Att'y., *Diversion Unit*, City of Philadelphia Office of the District Attorney (Feb. 18, 2020) (listing eligibility). Therefore, DDRD prosecutions interfere with the justice system's own efforts to create off-ramps for those individuals who are caught in the cycle of addiction and incarceration.[33] The bottom line is that prosecuting people who use

---

[32] In 2020, the program was renamed the Comprehensive Opioid, Stimulant, and Substance Abuse Program (COSSAP).

[33] This also harms the wellbeing of police officers and correctional staff, who exhibit highly-elevated rates of behavioral health and mental health challenges due partly to their experiences in responding to the overdose crisis. *See, e.g.,* Sean Goodison et al., *Law Enforcement Efforts to Fight the Opioid Crisis,* Priority Crim. Just. Needs Initiative 13 (2019) (providing an overview of stressors on police personnel emanating from overdose crisis response), and Amy Lerman, *Officer Health and Wellness: Results from the California Correctional Officer Survey*, U.C. Berkeley (2017) (describing correctional officers workplace wellness challenges emanating from

and share drugs is at cross-purposes with federal and state efforts to help people with addiction turn their lives around.

### g. DDRD prosecutions against people with addiction elevates their own risk of fatal overdose and withdrawal-related death

Given the federal focus on public health remedies to the overdose crisis, we urge this Court to consider the downstream effects of DDRD enforcement against people with substance use disorders. Prosecutors often contend that DDRD-type prosecutions will fight the overdose crisis and lead to less overdose mortality, but these enforcement drives—as well as prosecutions of people with SUD in general—actually create public health problems. In one study, the researchers found that incarceration for any cause does not reduce injection drug use, but actually interfered with the goal of reducing injection drug use insofar as it deprived the people who were incarcerated from access to effective treatment. DeBeck, et al., *Incarceration and Drug Use Patterns Among a Cohort of Injection Drug Users*, 104 Addiction 69 (2009).[34] Another study found that the number of police employees or the amount of corrections spending per capita does not reduce injection drug use, but that, conversely, increases in "hard" drug possession arrests, police employees, and corrections expenditures correlated with an increase in the spread of bloodborne diseases. Friedman, et al., *Relationships of Deterrence and Law Enforcement to Drug-Related Harms Among Drug Injectors in U.S. Metropolitan Areas*, 20 AIDS 93 (2006).[35]

For people with SUD, the health risks of incarceration are severe because very few jails

incarceration of people with substance use and mental health issues).

[34] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3731940/.

[35] Available at https://www.ncbi.nlm.nih.gov/pubmed/16327324.

or prisons offer treatment of any kind, let alone evidence-based behavioral therapies or medications for opioid use disorder (MOUD, commonly referred to as medication-assisted treatment or MAT). *See* Nat'l Center on Addiction and Substance Abuse, *Behind Bars II: Substance Abuse and America's Prison Population* at 43 (2010) (correctional facilities that do offer addiction-related services tend to provide only "alcohol and other drug education or low-intensive outpatient counseling sessions rather than evidence-based, intensive treatment").

      The lack of evidence-based treatment behind bars is actually a matter of life or death. The first moment this risk of death arises is when people are arrested while still under the influence. Failing to treat their withdrawal symptoms has sometimes resulted in death, exposing jurisdictions to significant civil liability. *See, e.g.,* Associated Press, *Snohomish County To Pay $1m Settlement Over Woman's Heroin Withdrawal Death In Jail*, Seattle Times (Oct. 28, 2019); Jo Ciavaglia, *Family Files Lawsuit in 2018 Death of Bucks County Inmate*, The Intelligencer (May 21, 2019) (noting $300,000 in settlements from withdrawal deaths at a Pennsylvania jail); Maxine Bernstein, *Record $10 Million Judgment Awarded In Washington County Jail Heroin Withdrawal Death*, The Oregonian (Dec. 7, 2018); Maryclaire Dale, *Pennsylvania County Pays Teen's Family Nearly $5M Over Heroin Withdrawal Death in Jail*, NBC Philadelphia (Oct. 24, 2018).

      We accordingly applaud the growing body of First Circuit case law that deems the failure of jails or prisons to provide MOUD to be an unconstitutional violation of the Eighth Amendment and in violation of the Americans With Disabilities Act and Rehabilitation Act. *See, e.g., Smith v. Aroostook County*, 922 F.3d 41 (1st Cir. 2019); *Pesce v. Coppinger*, 1:18-cv-11972-DJC (slip op'n) (D. Mass. Nov. 28, 2018).[36] *See generally* German Lopez, *How*

---

[36] Indeed, the Court should consider the likelihood of whether Mr. Cook would be provided MOUD in prison.

*America's Prisons are Fueling the Opioid Epidemic*, Vox.com (Mar. 26, 2018).

The next risk of death follows reentry. Unfortunately, in the absence of evidence-based treatment in the form of medication for opioid use disorder, brain chemistry for most people suffering opioid use disorder will not reset to the point of losing cravings for the drug. That means when they re-enter society, the risk of relapse is high. That risk of relapse transforms into an astronomic risk of death by overdose because people with OUD rapidly lose their tolerance to opioids behind bars. *See* Leo Beletsky et al., *Fatal Re-Entry: Legal and Programmatic Opportunities to Curb Opioid Overdose Among Individuals Newly Released from Incarceration,* 7 Ne. Univ. L.J. 155 (2015). Studies show that newly-released individuals are up to 120 times more likely to overdose and die during the first month after re-entry than the general population. *Id. See also* Paul Joudrey et al., *A Conceptual Model for Understanding Post-Release Opioid-Related Overdose Risk,* 14 Addiction Sci. & Clinical Prac. 17 (2019) (enumerating reentry risks).

This demonstrates a human cost of targeting people with addiction in DDRD cases rather than major players. Accordingly, it is tragic yet not surprising that, on the population level, incarceration rates themselves are a significant predictor of fatal overdose rates. Elias Nosrati et al., *Economic Decline, Incarceration, and Mortality from Drug Use Disorders in the USA between 1983 and 2014: An Observational Analysis*, Lancet Pub. Health 326, 330 (2019).

h.    **Statistical modeling suggests that DDRD prosecutions increase fatal overdose rates.**

For the reasons discussed in this section, it is clear that—despite the stated goals—DDRD prosecutions do not help reduce overdose deaths. The Health in Justice Action Lab, working with a team of econometric epidemiologists at Boston University recently conducted a statistical analysis to estimate how DDRD prosecutions covered in the media between 2000 and 2017

affected subsequent overdose rates. Using overdose death data from the Centers for Disease Control, we estimated that an increase in DIH prosecutions covered by the media is associated with a 7.8% increase (risk ratio of 1.078, 95% CI: (1.066, 1.091)) in overdose deaths. Further analysis suggested that in the states analyzed, there was a total of approximately 32,674 (95% CI: (27,843, 37,449)) deaths attributable to DIH prosecutions in the 50 states from 2000 – 2017 (Kelly Kung, Leo Beletsky, et al. "Analysis of Drug Induced Homicide Prosecutions as a Drug Overdose Prevention Measure" CPDD 2020 Annual Meeting, 6/24/2020).

The results of this analysis directly contradict claims that DDRD prosecutions avert future overdoses. Put simply, DDRD and similar prosecutions actually aggravate the crisis they are purported to solve.

## II.     How to Reduce Overdose Deaths

New Hampshire has been hit hard by the overdose crisis, and prosecutors are under intense pressure to demonstrate that they are "doing something." Unfortunately, DDRD prosecutions are doing something counterproductive.

There are much more effective approaches to solving the crisis than these counterproductive prosecutions. Numerous cost-benefit analyses have found that treatment outperforms punitive measures; it reduces demand.[37] Yet only around one in ten people with substance use disorder receive any type of appropriate evidence-based treatment, and only one in twenty within the criminal justice system. See Larochelle, et al., *Medication for Opioid Use*

---

[37] For example, a 1997 study found that treatment was 15 times more effective at reducing drug-related violent crimes than incarceration; and a 2006 study found that Wisconsin could reduce prison expenditures by $3 to $4 per additional dollar spent on treatment. See *Correctional and Sentencing Reform* at 29-32 (describing studies).

*Disorder After Nonfatal Opioid Overdose and Association With Mortality: A Cohort Study*, 169 Annals of Internal Medicine 137 (2018);[38] Krawczyk, et al., O*nly One In Twenty Justice-Referred Adults In Specialty Treatment For Opioid Use Receive Methadone Or Buprenorphine*, 36 Health Affairs (Millwood) 2046 (2017).[39] If society hopes that people suffering SUD will exercise their moral agency to seek treatment for their disorder, then society must make effective treatment available and accessible to people who need it. Put simply, if you want people to get off the highway of addiction, you need to provide off-ramps so they don't just drive into a ditch.

Unfortunately, as Mr. Cook's personal experiences and his mother's experiences show, services are woefully inadequate and inaccessible for the people who need them. It appears that Mr. Cook was offered almost no evidence-based treatment for his substance use disorders, and was apparently never offered medications for opioid use disorder.[40] This despite his own desire to find treatment as represented, ironically, in being driven to secure the medication of buprenorphine illegally because it was inaccessible legally.

This presents a huge opportunity, both in Mr. Cook's life as well as in society at large.

---

[38] Available at http://annals.org/aim/article-abstract/2684924/medication-opioid-use-disorder-after-nonfatal-opioid-overdose-association-mortality#.

[39] Available at https://www.ncbi.nlm.nih.gov/pubmed/29200340.

[40] Despite the widely-accepted evidence base for the efficacy of MOUD, the vast majority of inpatient recovery facilities nationwide shun them. Andrew Huhn et al.*, Differences in Availability and Use of Medications for Opioid Use Disorder in Residential Treatment Settings in the United States*, JAMA Network Open (2020) (finding that, in a national sample, only about 18% of inpatient facilities purporting to treat OUD offered MOUD). Methadone and buprenorphine function by reducing cravings and averting withdrawal, thereby improving wellbeing. Rates of non-medical substance use and overdose are significantly lower among people who are prescribed MOUD versus those who are not—these medications slash the risk of fatal overdose by 50-80%. Leo Beletsky, *21st Century Cures for the Opioid Crisis: Promise, Impact, and Missed Opportunities*, 44 Am. J. L. and Med. 359, 365 (2018). While abstinence-based programs remain the industry standard, they fail most patients with OUD, and, as with jails and prisons that do not offer MOUD, resulting in shockingly-high rates of relapse and overdose.

Mr. Cook and his mother have signaled a commitment to treatment and to expanding access to treatment to others who have developed addictions. From a policy perspective, the nation continues to work to find ways to expand access to addiction treatment. Some law enforcement and prosecution leaders are already making a difference by choosing to advocate for increasing the availability of evidence-based treatment in the community to close the "care gap." See Bloomberg American Health Initiative, *Policing and the Opioid Crisis: Standards of Care* (2018).[41] Advocating for increased funding and access to evidence-based treatment would work far better than counterproductive efforts that fail to deter drug crime and increase drug overdose deaths.

Indeed, MOUD has been shown to have remarkable effects at reducing crime. The key study, involving methadone treatment but generalizable to buprenorphine, found that for the group of individuals with OUD who were studied, consistent access to methadone treatment led to a 70% to 94% reduction in crime days per year. See John C. Ball & Alan Ross, *The effectiveness of methadone maintenance treatment: patients, programs, services, and outcome* (1991).

Initiatives like these pave the way to reducing the public health harms of drug addiction and the public safety harms of drug crime. DDRD prosecutions crowd out these proven approaches and effective investments. At present expenditure rates ($37,449.00 per inmate per year as of FY2018) and accounting for future inflation, a 17-year sentence will cost the US taxpayer well over $636,633 in incarceration costs, not accounting for inflation, pre-trial processing, prosecution, defense, and other costs. Bureau of Prisons, *Annual Determination of Average Cost of Incarceration Fee*, 84 FR 63891 (Nov. 19, 2019). Not all individuals convicted

---

[41] Available at http://americanhealth.jhu.edu/sites/default/files/inline-files/PolicingOpioidCrisis_LONG_final_0.pdf.

of DDRD are sentenced to such lengthy terms, but suffice it to say that the fiscal impact of the surging trend in these prosecutions is overwhelming.

## CONCLUSION

For the foregoing reasons, we respectfully urge the Court to consider, during its sentencing deliberations, how ineffective and counterproductive DDRD prosecutions are in combatting the overdose crisis, and how DDRD prosecutions were never intended to target defendants such as Mr. Cook.

Respectfully submitted,

/s/

JEREMIAH GOULKA, LL.B., JD[42]
Senior Fellow and Director of Justice Policy
Health in Justice Action Lab
Northeastern University School of Law

LEO BELETSKY, JD, MPH
Faculty Director, Health in Justice Action Lab
Professor of Law and Health Sciences
School of Law and
Bouvé College of Health Sciences
Northeastern University

416 Huntington Avenue
Boston, MA 02115
(617) 373-5540

September 9, 2020

---

[42] The authors wish to acknowledge the invaluable assistance of Louis Miyara, law student at Northeastern University and an intern in the Health in Justice Lab in the preparation of this brief. The authors also wish to acknowledge Lisa Newman-Polk, Esq., co-author in their *amicus curiae* brief in *Commonwealth v. Jesse Carrillo*, SJC-12617 (Mass. 2019), for insights in that brief that informed this memorandum.